**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>S-TRAN HOLDINGS, INC., et al.,[1]<br><br>                Debtors. | Case No. 05-11391 (KJC)<br>(Jointly Administered)<br><br>Chapter 11 |
| S-TRAN HOLDINGS, INC.;<br>SERVICE TRANSPORT, INC.; and<br>DIXIE TRUCKING COMPANY, INC.,<br><br>    Plaintiffs,<br><br>v.<br><br>PROTECTIVE INSURANCE COMPANY,<br><br>    Defendant. | Adversary Proceeding No. 07-51341 (KJC) |

**RESPONSE OF DEFENDANT, PROTECTIVE INSURANCE COMPANY,**
**TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Dated:  March 11, 2008          By:  /s/  John V. Fiorella
                                      John V. Fiorella (DE No. 4330)
                                      ARCHER & GREINER, P.C.
                                      300 Delaware Avenue
                                      Suite 1370
                                      Wilmington, DE   19801
                                      Telephone:  302-777-4350
                                      Facsimile:  302-777-4352
                                      E-mail:jfiorella@archerlaw.com
                                      *Counsel for Protective*
                                      *Insurance Company*

---

[1] The Debtors are the following entities:  S-Tran Holdings, Inc., a Delaware corporation; Service Transport, Inc., a Tennessee Corporation; and Dixie Trucking Company, Inc., a North Carolina Corporation.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES......................................... ii

I.    SUMMARY OF ARGUMENT...................................... 1

II.   PROTECTIVE'S REPLY TO PLAINTIFF' STATEMENT OF
      UNDISPUTED FACTS AND COUNTER-STATEMENT OF
      UNDISPUTED FACTS........................................ 4

III.  LEGAL ARGUMENT......................................... 11

      A.    THE AMOUNTS HELD BY PROTECTIVE UNDER THE
            COLLATERAL AGREEMENT AND THE GENERAL
            AGREEMENT OF INDEMNITY ARE NOT PROPERTY OF
            THE ESTATE....................................... 13

            1.    Proceeds of a letter of credit are
                  not property of the estate.................... 13

            2.    Neither the Premium Deposit nor the
                  LC Proceeds necessary to reimburse
                  Protective under the Collateral
                  Agreement or the General Agreement of
                  Indemnity are property of the estate.......... 17

      B.    PROTECTIVE HAS ALREADY RETURNED TO SERVICE
            AMOUNTS IN EXCESS OF THE AMOUNT OF THE
            CASH DEPOSIT..................................... 19

      C.    PROTECTIVE HAS NOT VIOLATED THE AUTOMATIC
            STAY............................................. 21

IV.   CONCLUSION............................................. 26

**TABLE OF AUTHORITIES**

**FEDERAL CASES**

In re Atlantic Gulf Communities Corp., 369 B.R.
    156 (Bankr. D. Del. 2007) .........................18, 22

Cedar Rapids Meats, Inc. v Hager (In re Cedar
    Rapids Meats, Inc.), 121 B.R. 562 (Bankr. N.D.
    Iowa 1990) ......................................18, 22

Demczyk v. Mutual Life Insurance Co. of New York
    (In re Graham Square, Inc.), 126 F.3d 823 (6th
    Cir. 1997) .........................................16

Dolphin Titan International, Inc. v. Gray & Co.,
    Inc. (In re Dolphin Titan International Inc.),
    93 B.R. 508 (Bankr. S.D. Tex. 1998) ...............18, 22

Healy/Mellon-Stuart Co. v. Coastal Group, Inc.
    (In re Costal Group, Inc.), 100 B.R. 177
    (Bankr. D. Del. 1989) ...............................26

Hechinger Investment Company of Delaware, Inc. v.
    Allfirst Bank (In re Hechinger Investment
    Company of Delaware, Inc.), 282 B.R. 149
    (Bankr. D. Del. 2002) ...............................16

International Finance Corp. v. Kaiser Group
    International Inc. (In re Kaiser Group
    International Inc.), 399 F.3d 558 (3d Cir.
    2005) ...........................................13, 22

In re Lennington, 286 B.R. 673 (Bankr. C.D. Ill.
    2001) ..............................................25

Mother African Union Methodist Church v. The
    Conference of AUFCMP Church  (In re The
    Conference of AUFCMP Church), 184 B.R. at 217 ......25, 26

Northeast Glass, Inc. v. Alpen, Inc. (In re
    Northeast Glass, Inc.), 112 B.R. 475 (D. Mass.
    1990) ..............................................25

Novak v. Patton (In re Compudyne, Inc.), 191 B.R.
    4 (Bankr. D. Conn. 1995) .........................18, 22

OHC Liquidation Trust v. Discover Re, et al. (In
    re Oakwood Homes Corp.), 342 B.R. 59 (Bankr. D.
    Del. 2006) ................................13, 14, 21, 22

PNC Bank, N.A. v. In re Spring Ford Industrial,
    Inc. (In re Spring Ford Industrial, Inc.), 338
    B.R. 255 (E.D. Pa. 2006) .........................13, 22

Simpson v. Rodgers (In re Rodgers), 266 B.R. 834
    (Bankr. W.D. Tenn. 2001) ..............................25

Stratton, et al. v. Mariner Health Care, Inc. (In
    re Mariner Post-Acute Network), 329 B.R. 481
    (Bankr. D. Del. 2005) ................................25

Two Trees, et al. v. Builders Transport, Inc. (In
    re Builders Transport, Inc.), 471 F.3d 1178
    (11th Cir. 2006) .....................................16

University Medical Ctr. v. Sullivan (In re
    University Medical Ctr.), 973 F.2d 1065 (3d
    Cir. 1992) ...........................................25

VFB L.L.C. v. The Money's Trust (In re VF Brands,
    Inc.), 282 B.R. 134 (Bankr. D. Del. 2002) .............25

**STATUTES**

11 U.S.C. §362 ........................1, 3, 12, 21, 26, 27

11 U.S.C. §362(k)(1)...................................25

11 U.S.C. §541 ....................................14, 21

11 U.S.C. §541(d)........................2, 17, 18, 19

11 U.S.C. §549 ....................................12, 27

Defendant, Protective Insurance Company ("Protective"), says by way of Response to Plaintiffs' ("Service") Motion for Partial Summary Judgment (the "Motion") as follows:

## I. **SUMMARY OF ARGUMENT**

1.    Service's Complaint asserts two causes of action: a contract claim asserting that Protective has breached its obligations under the terms of the insurance policies, the Collateral Agreement and General Agreement of Indemnity pertaining to the LC Proceeds, and a claim that Protective has violated the automatic stay provisions of 11 U.S.C. §362 by retaining control over the LC Proceeds after demand for the LC Proceeds by Service and by using the LC Proceeds to pay workers compensation claims and for claims reserves.

2.    The premise of Service's claim for violation of the stay is that Protective has used estate property in administering and settling claims asserted against Protective (primarily workers compensation claims).  The property which Service contends Protective used are the LC Proceeds and the premium deposit of $477,000.  The law in the Third Circuit is clear that the LC Proceeds are not property of the estate.

3.    Service acknowledges clear prevailing case law and the "independence principle" on which they are based.

1

Service however seeks to avoid these decisions and distinguish them and the "independence principle" by arguing that property of the estate does include a contractually based claim for return of letter of credit proceeds as asserted by Service in Counts Four and Five of the Complaint.  Protective acknowledges that while such contract claims are property of the estate assertable even though the claims seek return of unused proceeds of a letter of credit, this does not make the LC Proceeds themselves property of the estate.

4.   Out of the amounts held by Protective, Service only held legal title to, at most, the premium deposit, and not the LC Proceeds.  Under the Collateral Agreement and General Agreement of Indemnity, Service's sole equitable interest in the LC Proceeds and the premium deposit is a contingent right to a return of the balance remaining after all insurance and bond claims have been paid.  Where the debtor holds only bare legal title in property, the estate's property interest in the property is limited to the extent of the debtor's equitable interest in the property.  11 U.S.C. §541(d).  Funds set aside and paid by a debtor to satisfy future workers compensation claims, other insurance or other obligations of a debtor are not property of the estate.

5.    To the extent that the premium payment of $477,000 constitutes property of the estate, Protective has returned more than this amount to Service during the progress of the case.  Protective has returned to Service $516,319.86 out of the amounts held by Protective as collateral for Service's obligations to Protective.  This aggregate amount was paid at the demand of Service to third parties who owed Service accounts receivable and who asserted cargo claims against Service.  These third party account debtors in turn paid the full amount of the account receivable to Service without seeking to set off Service's debt to them for cargo losses.

6.    Protective asserts that there is no provision of 11 U.S.C. §362 which would require it to seek relief from the automatic stay to use the LC Proceeds which is not property of the estate to pay claims for which Protective is directly and primarily liable.  The payment of these claims does not diminish Service's estate.  Service's sole property right in the LC Proceeds and the cash deposit is the balance remaining after claims under insurance policies and bonds for which Protective is liable directly as an insurer or as surety have been paid.  The potential existence of this contingent remainder interest does not translate into a violation of the automatic stay.

3

## II. PROTECTIVE'S REPLY TO PLAINTIFF' STATEMENT OF UNDISPUTED FACTS AND COUNTER-STATEMENT OF UNDISPUTED FACTS

7.    Protective is an insurance and surety company. Beginning January 1, 2002, Protective provided workers compensation insurance coverage and excess indemnity coverage to Service.  As a surety, Protective provided a bodily injury/property damage bond and a cargo bond. Morfas Affidavit, ¶2.

8.    **Workers Compensation** - Protective has issued a Workers Compensation and Employers Liability Insurance Policy, No. WD001340 (the "WC Policy") which provides workers compensation coverage for Service in those states in which Service conducted business.[2]  As required by the various states' laws, the WC Policy provides coverage for workers compensation benefits for claimants on a first party basis.  The WC Policy explicitly provides that Protective itself is directly liable and obligated to pay the claimants from the first dollar of loss. Part One, Section H of the Policy between Protective and Service is entitled, "Statutory Provisions" and contains the following paragraphs (note that "we" or "us" refers to Protective, and "you" or "yours" refers to Service):

> 2.  Your default or the bankruptcy or insolvency of you or your estate will

[2] The Policy applies to the states of AL, AK, CA, GA, IN, KY, MI, MS, NC, SC and TN.

> not relieve us of our duties under this
> insurance after an injury occurs.
>
> 3.   *We are directly and primarily
> liable* to pay any person entitled to
> the benefits payable by this insurance.
> Those persons may enforce our duties;
> so may an agency authorized by law.
> Enforcement may be against us or
> against you and us.

emphasis added).  Morfas Affidavit ¶3, Exhibit "A".

9.   As between Protective and Service, Service has a

$200,000 per claim deductible and is responsible to

reimburse Protective for the first $200,000 of any claim.

This deductible does not, however, alter Protective's

direct liability to pay benefits under the WC Policy.

Deductible Policy Endorsements provide that:

> This deductible endorsement applies
> between you and us.  It does not affect
> or alter the rights of others under the
> policy.  You will reimburse us for any
> deductible amounts that we advance or
> are required by law to pay.
>
> We remain responsible for the full
> payment of all claims under this policy
> without regard to your ability or
> intention to reimburse us for the
> deductible amounts.  The contract of
> insurance shall be fully enforceable by
> your employees or their dependents
> against us.  (CA Endorsement)

Under the WC Policy, Protective has the responsibility to

defend and administer the claims and the discretion and

authority to determine the amount of any claim settlement.

Morfas Affidavit, ¶4, Exhibit "A".

10.   The type of workers compensation policy purchased by Service represents a conscious financial decision by Service.  The policy selected had substantially reduced premiums in return for the large per claim deductible amount.  However, Protective assumed direct responsibility to the claimant from the first dollar of the claim under the policy.  In return, Service agreed to the corresponding Collateral and Indemnity Agreements, which provided that Protective could access the collateral to pay for these direct obligations, among other obligations. Morfas Affidavit, ¶5.

11.   Pre-petition, the WC Policy was administered by Protective, making claims payments directly to claimants, with Protective checks, and billing Service monthly for the amount of claims payments made in the preceding month. Post-petition, Protective has continued to make the claims payments as required under the policy and state law.  All claims activity and information was and remains available to Service through a secure web site. Morfas Affidavit, ¶6.

12.   **Excess Indemnity Coverage**  -  Protective has issued Policy No X-1435 which provided excess indemnity insurance coverage to Service for losses due to personal injury and property damage claims (the "Liability Policy"). The coverage is traditional indemnity coverage in excess of

a $100,000 self-retention by Service.  The Liability Policy

provides that:

> The Company hereby agrees to indemnify
> the **named** … **insured** for the **ultimate
> net loss**, less the self retention, …,
> which the **named** … **insured** has or may
> become by law liable to pay and has
> paid to any person as **damages**….

(emphasis in original).  All claims under this coverage

have been stayed as a result of the bankruptcy.  Protective

has established reserves for the claims asserted under the

Liability Policy.  Morfas Affidavit, ¶7.

13.  **Personal Injury and Property Damage Surety**

**Coverage** - Under federal regulations, as a common carrier

with a self-retention, Service is required to provide

financial responsibility to injured claimants in the form

of a federally mandated surety bond.  Protective has issued

a Motor Carrier Bodily Injury Liability and Property Damage

Liability Surety Bond (the "Liability Bond").  Under the

Liability Bond Protective is the surety for the payment of

any personal injury or property damage judgment obtained

against Service up to the amount of $1,000,000.  However,

the excess indemnity coverage under the Liability Policy

provides insurance coverage in excess of the $100,000 self-

retention for each claim.  Because the Liability Bond is a

judgment bond, no liability shall attach to Protective, as

the surety, until a Judgment has been rendered against the Principal, Service.  This obligation is completely distinguishable from the direct obligation of Protective to third parties under the WC Policy.  Morfas Affidavit, ¶8.

14.  **Cargo Surety Coverage**  -  Under ICC Regulations, Service, as a common carrier with a self-retention, is required to provide evidence financial responsibility to secure payment of cargo claims up to $5,000 per shipment. Protective, as surety, has issued such a bond (the "Cargo Bond") for Service.  Morfas Affidavit, ¶9.

15.  To indemnify Protective against its **direct** obligations to pay workers compensation claims within the deductible, to pay **as surety** unsatisfied personal injury and property damage judgments against Service up to $100,000 per claim and to pay **as surety** cargo claims up to $5,000 per shipment not paid by Service, and for deferred premiums, Protective required that Service secure a Letter of Credit in favor of Protective in the amount of $3,477,000 (the "LC Proceeds").  Protective drew on the Letter of Credit pre-petition.  Morfas Affidavit, ¶10.

16.  Under the terms of the insurance policies and the Collateral Agreement and General Agreement of Indemnity pertaining to the LC Proceeds, Protective is permitted to use the LC Proceeds to (i) pay the amounts of workers

compensation claims asserted against Protective within the deductible and the expenses incurred in defense of such claims, (ii) reimburse Protective for amounts paid under the Liability Bond and Cargo Bond and (iii) to retain such amounts as Protective determines are reasonable to create a reserve for the anticipated ultimate amount of the workers compensation claims within the deductible, potential claims on the Liability Bond and the Cargo Bond.  Morfas Affidavit, ¶11, Exhibits "B" and "C".

17.  Protective has provided Service on a periodic basis the amounts of claim payments, incurred expenses and reserves calculated for each claim and type of claim.  The current balance of the unapplied LC Proceeds is $1,285,682.84 as of January 31, 2008.  Reserves for the various types of potential exposure is as follows:

| Workers Compensation | $350,035.00 |
|---|---|
| Liability Bond | $445,950.21 |
| Cargo Bond | $292,000.00 |
| Expense Reserve | $197,631.63 |

Morfas Affidavit, ¶2.

18.  To date, Protective has returned to Service $516,319.86 out of the amounts held by Protective as collateral for Service's obligations to Protective.  This aggregate amount was paid at the demand of Service to third party claimants who asserted cargo claims against Service.

9

Absent a bankruptcy and in the ordinary course of business, each of these cargo claimants who also owed Service an account receivable would have set-off the amount of the cargo claim against the account receivable and paid Service the net.  In order to satisfy one of its secured creditors, Service sought to maximize the amount of its account receivable collections and prevent any set-off by the account debtors of the their cargo claims against Service. Morfas Affidavit, ¶13.

19.  The determination of the validity of any cargo claim was exclusively within the province of Service. Service had all of the delivery and shipment records to evaluate the claims.  Service essentially threatened Protective that it would evaluate and negotiate down a number of cargo claims asserted by certain account debtors of Service, only if Protective would agree to pay these cargo claims under the Cargo Bond.  Morfas Affidavit, ¶14.

20.  Protective and Service agreed that Protective would pay the cargo claims to Service's account debtors under the Cargo Bond even though Protective asserted that it had no obligation under the Cargo Bond to act as a surety where the Cargo Bond claimant had a right of set off against the Service, as principal.  The agreement reached between Service and these account debtors was that if

10

Protective paid the cargo claim, then the account debtor would pay the full amount of the account receivable owed to Service without setting off the cargo claims.  Morfas Affidavit, ¶15.

21.  The net effect of these three party agreements was return of $516,319.86 from the amounts held by Protective to Service.  Morfas Affidavit, ¶16.

22.  Since the filing of the petition, Protective has continued to make workers compensation payments to claimants as required by the various states' laws in which Service operated and in accordance with the terms of the Workers Compensation Policy issued by Protective.  There are currently 16 active cases.  Protective has made total payments on all workers compensation claims within the deductible since the date of filing in the amount of $2,104,237.71 as of January 31, 2008.  Morfas Affidavit, ¶17.

### III. <u>LEGAL ARGUMENT</u>

23.  Service's Complaint asserts essentially two causes of action: breach of contract and violation of the automatic stay.  The contract claim asserts that Protective has breached its obligations under the terms of the insurance policies, the Collateral Agreement and General Agreement of Indemnity pertaining to the LC Proceeds.

Service alleges that Protective has improperly and excessively paid claims and fixed claim reserve amounts. (Complaint, Counts One, Four and Five).  The second claim is that Protective has violated the automatic stay provisions of 11 U.S.C. §362 by retaining control over the LC Proceeds after demand for the LC Proceeds by Service and by using the LC Proceeds to pay workers compensation claims and for claims reserves.  Service also alleges that the payments on such claims constitutes a post petition transfer of Service's property contrary to 11 U.S.C. §549. (Complaint Counts Two and Three).

24.  Service has moved for partial summary judgment seeking entry of a judgment ordering Protective to: (1) turnover the full amount of the LC Proceeds and the advance premium deposit ($3,863,142) plus interest since these funds are property of the estate; (2) turnover the full amount of the LC Proceeds and the advance premium deposit ($3,863,142) interest and sanction because Protective has violated the automatic stay; and (3) turnover $2,309,494 as avoided post petition transfers of the property of the estate.  The premise of all elements of the relief requested is that the LC Proceeds and the advance premium deposit held by Protective are property of the estate.

12

**A.   THE AMOUNTS HELD BY PROTECTIVE UNDER THE COLLATERAL AGREEMENT AND THE GENERAL AGREEMENT OF INDEMNITY ARE NOT PROPERTY OF THE ESTATE**

### 1.   Proceeds of a letter of credit are not property of the estate.

25.   The premise of Service's claim for violation of the stay is that Protective has used estate property in administering and settling claims asserted against Protective (primarily workers compensation claims).  The property which Service contends Protective used are the LC Proceeds and the advance premium deposit of $477,000.  This claim fails because the LC Proceeds are not property of the estate.[3]  The law in the Third Circuit is clear that the LC Proceeds are not property of the estate.  OHC Liquidation Trust v. Discover Re, et al. (In re Oakwood Homes Corp.), 342 B.R. 59, 67 (Bankr. D. Del. 2006); Int'l Fin. Corp. v. Kaiser Group Int'l Inc. (In re Kaiser Group Int'l Inc.), 399 F.3d 558, 566 (3d Cir. 2005); PNC Bank, N.A. v. In re Spring Ford Indus., Inc. (In re Spring Ford Indus., Inc.), 338 B.R. 255, 261 (E.D. Pa. 2006).

26.   In the case of Oakwood Homes the debtor home manufacturer had entered into insurance agreements with Discover Re, to provide for issuance of worker's

---

[3] Protective has already returned $516,319.86, more than the advance premium deposit of $477,000 to Service, through the payment of cargo claims to account debtors of Service who in turn immediately paid this amount to Service.

compensation, automobile liability, and general liability
insurance policies to the debtor.  The debtor also executed
a Premium Loan and Agreement and Indemnity Agreement
requiring the debtor to reimburse the insurer for certain
deductibles and to secure this obligation with a letter of
credit.  Oakwood Homes, 342 B.R. at 63.  The insurer had
drawn down the entire $9.5 million balance of the LC,
having paid out only $1.5 million to claimants.  When the
debtor sought recovery of the balance being held by the
insurer, the court held:

> As discussed below, § 541 does not
> cover the property that the plaintiff
> seeks to recover because the surety and
> letter of credit and their proceeds are
> not property of the estate, and the
> recovery is disputed and unliquidated
> so § 542 would be inappropriate under
> the circumstances.  Accordingly, [that
> Count of debtor's complaint] will be
> dismissed for failure to state a claim.

Id. at 66-67.  The court noted that while the debtor may
have had a contractual claim for return of the balance of
the letter of credit proceeds, the claim was not viable on
the theory that the proceeds were property of the estate
under 11 U.S.C. §541.[4]

---

[4] It should be noted that the plaintiff did not even attempt to argue
that the payments made to the claimants out of the LC proceeds were
property of the estate.  Rather, plaintiff argued only that the alleged
remaining unpaid balance of the letter of credit proceeds were property
of the estate, and lost on that issue.

27.    In its Memorandum, Service readily acknowledges these cases and the "independence principle" on which they are based.  Service however seeks to avoid the clear holding of these cases and distinguish them and the "independence principle" by arguing that the operation of the "independence principle" does not prevent a debtor from pursuing a contractually based claim as asserted by Service in Counts Four and Five of the Complaint.  With this, Protective has always agreed.  Protective has defended Counts Four and Five of Service's Complaint on the basis that the contractual claims are not factually sustainable. Protective acknowledges that the contract claims are property of the estate and can be asserted even though the claims seek return of unused proceeds of a letter of credit.

28.    None of the cases cited by Service either holds or implies that the application of letter of credit proceeds by the drawing party is in any way improper or is dependent on obtaining relief from the automatic stay. What these cases do hold is that a creditor can only retain so much of the letter of credit proceeds as it is contractually entitled.  The debtor's contractual claim for a return of the excess proceeds is property of the estate, but the letter of credit proceeds are not.

15

29.   <u>Two Trees, et al. v. Builders Transport, Inc.</u> <u>(In re Builders Transport, Inc.)</u>, 471 F.3d. 1178 (11th Cir. 2006) (the issue was how much of the letter of credit proceeds the creditor was contractually entitled to retain as the proper measure of damages to the creditor.); <u>Hechinger Investment Company of Delaware, Inc. v. Allfirst Bank</u> <u>(In re Hechinger Investment Company of Delaware, Inc.)</u>, 282 B.R. 149, 161 (Bankr. D. Del. 2002) ("[I]t is well settled that the proceeds from a letter of credit do not constitute property of the estate under § 541. Therefore, such proceeds … are not subject to turnover under §542 as property that the Debtor 'may use... under section 363.'… The fact that Debtor may have equitable interests in certain breach of contract claims which seek to recover the Drawn Funds, which interests constitute property of the estate, does not alter the result."); <u>Demczyk v. Mut. Life Ins. Co. of New York</u> <u>(In re Graham Square, Inc.)</u>, 126 F.3d. 823, 831 (6th Cir. 1997) ("Under 11 U.S.C. §541, the trustee succeeds only to the title and rights in property that the debtor had and takes the property subject to the same restrictions that existed at the time the debtor filed the petition…. Thus, a debtor's rights may not be expanded beyond what they were at the commencement of the case." "the debtor's cause of action

is based upon the underlying contract and not on the letter of credit.  The characterization or status of the $332,000 had passed from 'proceeds of the letter of credit' to 'commitment fee under the contract.'  We have previously held that property of the estate includes the debtor's interest in a cause of action."}.

30.  Regardless of Service's attempts to argue around it, the "independence principle" provides that the LC Proceeds were simply not Service's property.  While Protective's right to retain and use these proceeds is subject to the terms of the insurance policies, the Collateral Agreement and General Agreement of Indemnity, these agreements do not make the LC Proceeds the property of Service.

### 2.   **Neither the Premium Deposit nor the LC Proceeds necessary to reimburse Protective under the Collateral Agreement or the General Agreement of Indemnity are property of the estate.**

31.  11 U.S.C. §541(d) provides that property in which a debtor holds only legal title and not an equitable interest to property, becomes property of the estate only to the extent of the legal title, but not to the extent of any equitable interest that the debtor does not hold.  Out of the amounts held by Protective, Service only held legal title to, at most, the premium deposit, and not the LC

Proceeds.  Under the Collateral Agreement and General
Agreement of Indemnity, Service's sole equitable interest
in the LC Proceeds and the cash deposit is a contingent
right to a return of the balance remaining after all
insurance and bond claims have been paid.

32.  Funds set aside and paid by a debtor to satisfy
future workers compensation claims, other insurance or
other obligations of a debtor are not property of the
estate.  Novak v. Patton (In re Compudyne, Inc.), 191 B.R.
4 (Bankr. D. Conn. 1995) (funds deposited as security for
payment of insurance obligations of debtor were not
property of the debtor's estate; motion to compel turnover
denied); Cedar Rapids Meats, Inc. v Hager (In re Cedar
Rapids Meats, Inc.), 121 B.R. 562 (Bankr. N.D. Iowa 1990)
(fund established for payment of workers compensation
claims not property of the estate; motion for turnover of
funds denied); Dolphin Titan Int'l., Inc. v. Gray & Co.,
Inc. (In re Dolphin Titan Int'l. Inc.), 93 B.R. 508 (Bankr.
S.D. Tex. 1998) (same).

33.  In the case of In re Atlantic Gulf Communities
Corp., 369 B.R. 156 (Bankr. D. Del. 2007), the Bankruptcy
Court considered the right of a trustee to return of a fund
created by the debtor to assure construction of certain
utilities.  Relying on 11 U.S.C. §541(d) the Court

concluded that "an escrow into which a debtor puts its property (or from which the debtor is entitled to payments after satisfying a condition) is not property of the estate." Id. at 164. Even though the debtor held some equitable interest in the fund, it did not hold all equitable interests. Consequently, the account itself was not property of the estate even though the contingent interest of debtor was property of the estate. Id. at 164-165.

34. The clear purpose of the premium deposit and LC Proceeds as provided in the Collateral Agreement and General Agreement of Indemnity was to create a fund out of which the workers compensation claims and bond liabilities would be paid. Service's sole property interest in these funds was the equitable right to a return of any balance not paid out or not needed by Protective as a reserve against future claims.

### B.   PROTECTIVE HAS ALREADY RETURNED TO SERVICE AMOUNTS IN EXCESS OF THE AMOUNT OF THE CASH DEPOSIT

35. To the extent that the advance premium payment of $477,000 constitutes property of the estate, Protective has returned more than this amount to Service during the progress of the case. To date, Protective has returned to Service $516,319.86 out of the amounts held by Protective

as collateral for Service's obligations to Protective.
This aggregate amount was paid at the demand of Service to
third party claimants who asserted cargo claims against
Service.

36.   Absent a bankruptcy and in the ordinary course of
business, each of these cargo claimants who also owed
Service an account receivable would have set-off the amount
of the cargo claim against the account receivable and paid
Service the net.   In order to satisfy one of its secured
creditors, Service sought to maximize the amount of its
account receivable collections and prevent any set-off by
the account debtors of the their cargo claims against
Service.

37.   The determination of the validity of any cargo
claim was exclusively within the province of Service.
Service had all of the delivery and shipment records to
evaluate the claims.   Service essentially threatened
Protective that it would evaluate and negotiate down a
number of cargo claims asserted by certain account debtors
of Service, only if Protective would agree to pay these
cargo claims under the Cargo Bond.

38.   Protective and Service agreed that Protective
would pay the cargo claims to Service's account debtors
under the Cargo Bond even though Protective asserted that

20

it had no obligation under the Cargo Bond to act as a surety where the Cargo Bond claimant had a right of set off against the Service, as principal.  The agreement reached between Service and these account debtors was that if Protective paid the cargo claim, then the account debtor would pay the full amount of the account receivable owed to Service without setting off the cargo claims.

39.  The net effect of these three party agreements was return of $516,319.86 from the amounts held by Protective to Service.

### C.   PROTECTIVE HAS NOT VIOLATED THE AUTOMATIC STAY

40.  Service asserts that Protective has violated the automatic stay provision of 11 U.S.C. §362 by paying out workers compensation claims and by maintaining reserves for claims assertable against Protective under the WC Policy as well as the PI and Cargo Bonds.  Service's contention is premised upon its conclusion that the LC Proceeds and the asserted cash deposit held by Protective are property of the estate under 11 U.S.C. §541.

41.  The funds held by Protective pursuant to the Collateral Agreement and General Agreement of Indemnity are not property of the estate.  Proceeds of a letter of credit are not property of the estate.  OHC Liquidation Trust v. Discover Re, et al. (In re Oakwood Homes Corp.), 342 B.R.

59, 67 (Bankr. D. Del. 2006); Int'l Fin. Corp. v. Kaiser
Group Int'l Inc. (In re Kaiser Group Int'l Inc.), 399 F.3d
558, 566 (3d Cir. 2005); PNC Bank, N.A. v. In re Spring
Ford Indus., Inc. (In re Spring Ford Indus., Inc.), 338
B.R. 255, 261 (E.D. Pa. 2006).   In re Atlantic Gulf
Communities Corp., 369 B.R. 156 (Bankr. D. Del. 2007).
Funds set aside and paid by a debtor to satisfy future
workers compensation claims, other insurance or other
obligations of a debtor are not property of the estate.  In
re Atlantic Gulf Communities Corp., 369 B.R. 156 (Bankr. D.
Del. 2007); Novak v. Patton (In re Compudyne, Inc.), 191
B.R. 4 (Bankr. D. Conn. 1995); Cedar Rapids Meats, Inc. v
Hager (In re Cedar Rapids Meats, Inc.), 121 B.R. 562
(Bankr. N.D. Iowa 1990); Dolphin Titan Int'l., Inc. v. Gray
& Co., Inc. (In re Dolphin Titan Int'l. Inc.), 93 B.R. 508
(Bankr. S.D. Tex. 1988).

     42.  The LC Proceeds held by Protective are subject to
two agreements: the Collateral Agreement and General
Agreement of Indemnity.  Under the Indemnity Agreement,
Service agreed to indemnify Protective against all
liability, losses, costs, damages and expenses of any
nature incurred in discharging any liability under the PI
and Cargo Bonds (Indemnity Agreement, ¶2, Morfas Affidavit,
Exhibit C) as well as any deductible amounts paid by

Protective under the WC Policy (Indemnity Agreement, ¶9, ,
Morfas Affidavit, Exhibit C).  In addition, Service agreed
to provide Protective with funds in an amount necessary to
cover any reserves or increases in reserves determined by
Protective in connection with any claims under any bond or
insurance deductible.  (Indemnity Agreement, ¶3 , Morfas
Affidavit, Exhibit C).

43.  Under the Collateral Agreement, Service agreed
that the amounts held by Protective would secure it against
liability, losses, costs, damages and expenses of any
nature incurred in discharging any liability under the PI
and Cargo Bonds as well as any deductible amounts paid by
Protective under the WC Policy.  (Collateral Agreement, ¶¶A
and B, , Morfas Affidavit, Exhibit B).

44.  To date, Protective has paid two types of claims:
workers compensation claims and Cargo Bond claims.[5]  As
noted above, the Cargo Bond claims were paid at the direct
insistence of Service and resulted in Service being
returned $516,319.86, an excess over the amount of the
$477,000 premium deposit paid directly from Service
prepetition.  Despite Service's request for relief for a
return of $3,863,142, Protective assumes that the payment
of the $516,319.86 in Cargo Bond claims to which Service

---

[5] Protective has maintained reserves for potential claims under the PI
and Cargo Bonds as well as the WC Policy.

both demanded and agreed is not actually implicated in the
Motion.

45.   The workers compensation payments are apparently
at the core of Service's Motion.  Since the filing date,
Protective has paid approximately $2,104,237.71 for workers
compensation claims.  Protective paid these claims as a
result of its direct and primary liability to the workers
compensations claimants under various states' laws and as
specifically provided in the WC Policy, Part One, Section H
of the Policy between Protective and Service is entitled,
"Statutory Provisions" and contains the following
paragraphs (note that "we" or "us" refers to Protective,
and "you" or "yours" refers to Service):

> 2.  Your default or the bankruptcy or
> insolvency of you or your estate will
> not relieve us of our duties under this
> insurance after an injury occurs.
>
> 3.  *We are directly and primarily
> liable* to pay any person entitled to
> the benefits payable by this insurance.
> Those persons may enforce our duties;
> so may an agency authorized by law.
> Enforcement may be against us or
> against you and us.

**(emphasis added)  (Morfas Affidavit, Exhibit A).**

46.  Protective's liability for these claims exists
without regard to Service's bankruptcy filing and its
obligation to pay these claims may be enforced without
regard to whether the automatic stay protects Service.  The

automatic stay does not operate to protect the debtors insurers, guarantors, or sureties.  In re Lennington, 286 B.R. 673, 674 (Bankr. C.D. Ill. 2001).  This rule applies whether or not the surety or guarantor would have a claim for indemnification against the debtor's estate.  Northeast Glass, Inc. v. Alpen, Inc. (In re Northeast Glass, Inc.), 112 B.R. 475, 477, n.5 (D. Mass. 1990).  Even a bankruptcy discharge would not affect the direct liability of an insurer or even a guarantor.  Simpson v. Rodgers (In re Rodgers), 266 B.R. 834, 836-37 (Bankr. W.D. Tenn. 2001); VFB L.L.C. v. The Money's Trust (In re VF Brands, Inc.), 282 B.R. 134, 137 (Bankr. D. Del. 2002).

     47.  Even if this Court was to determine that Protective did violate the automatic stay, there is no justification for a finding that such a violation is willful.  The "willfulness" element of 11 U.S.C. §362(k)(1) is negated where there is persuasive legal authority for Protective's position and Protective had a good faith belief in the validity of its actions.  Stratton, et al. v. Mariner Health Care, Inc. (In re Mariner Post-Acute Network), 329 B.R. 481, 488 (Bankr. D. Del. 2005) (citing University Med. Ctr. v. Sullivan (In re University Med. Ctr.), 973 F.2d 1065, 1088 (3d Cir. 1992); Mother African Union Methodist Church v. The Conference of AUFCMP Church

25

(In re The Conference of AUFCMP Church), 184 B.R. at 217
(denying contempt sanctions not appropriate where based on
persuasive legal authority); Healy/Mellon-Stuart Co. v.
Coastal Group, Inc. (In re Costal Group, Inc.), 100 B.R.
177, 179 (Bankr. D. Del. 1989) (a "scintilla of suggestion"
in case law that supports a position removes the action
from being classified as a willful violation.

48.   Protective asserts that there is no provision of
11 U.S.C. §362 which would require it to seek relief from
the automatic stay to use property which is not property of
the estate to pay claims for which Protective is directly
and primarily liable.   The payment of these claims does not
diminish Service's estate.   Service's sole property right
in the LC Proceeds and the cash deposit is the balance
remaining after claims under insurance policies and bonds
for which Protective is liable directly as an insurer or as
surety have been paid.   The potential existence of this
contingent remainder interest does not translate into a
violation of the automatic stay.

### IV. <u>CONCLUSION</u>

For the reasons stated above, defendant, Protective
Insurance Company respectfully requests that the Court deny
Plaintiffs' Motion for Partial Summary Judgment and enter
an Order determining that protective Insurance Company has

not violated the automatic stay provisions of 11 U.S.C.

§362 or engaged in a post-petition transfer of property of

the estate in contravention of 11 U.S.C. §549.

3149125v2